Good morning. May it please the Court. Daniel Habib, Federal Defenders of New York, on behalf of Mr. Jimenez. The District Court erred in denying Mr. Jimenez's motion to dismiss the indictment because Section 922G6, which prohibits any dishonorably discharged veteran from possessing ammunition, violates the Second Amendment. Applying this Court's two-step test, at Step 1, the statute places a severe burden on core protected conduct. Section 922G6 imposes a categorical, status-based restriction on the possession of all ammunition, in all places, for all purposes, and for all time. It admits of no alternatives or exceptions. The statute encroaches on the Amendment's very core, the right to possess and use arms for the purpose of self-defense in the home. Why don't we conclude, can't we conclude that being dishonorably discharged is akin to being convicted of a felony? No. For several reasons, Judge Pooler. First of all, the Heller dictum by its terms speaks of longstanding prohibitions on the possession of firearms by felons. And this statute is three times removed from Heller. It applies to dishonorably discharged veterans, not felons. It applies to ammunition, not firearms. And it is not longstanding. But to Your Honor's point, the only basis in the record in this case for so concluding is a small and arbitrary subset of dishonorable discharges issued during a limited period of time not relevant in this case. That is, between 2013 and 2016, in two smaller branches of the armed forces. The government, and it's the government's burden to rebut the presumption of Second Amendment protection, has not shown what the practice was in 1968, when this legislation was first enacted, not shown what the practice was in 1986, when the legislation was amended to encompass the possession of ammunition. And more to the point, the project of facial constitutional adjudication does not depend on the practice of the armed forces at a particular period in time. Although if the armed forces thought that Mr. Jimenez shouldn't be carrying a weapon, why would civilian society think otherwise? The armed forces concluded that Mr. Jimenez should be dishonorably discharged. But the historical practice of the armed forces is true. The historical practice in the military, as confirmed by Winthrop's treatise, which is the principal treatise on the subject cited in our opening brief, is that a dishonorable discharge, although it removes the servicemember from the armed forces, has never been understood to impose any legal disability, military or civil. There is simply no historical evidence that prior to 1986, dishonorably discharged veterans lost the right to carry ammunition. In addition, a court-martial ---- Sotomayor, do you agree that the conduct for which he was dishonorably discharged equates to a felony in the civil --"civilian criminal justice system"? Not necessarily, Your Honor. No. I'm asking you this on an as-applied-to-your-client basis, not whether it could ever, whether in his case the conduct for which he was dishonorably discharged would support a criminal felony conviction. The conduct for which he was dishonorably discharged could have been prosecuted as a civilian felony. The elements of the UCMJ offenses for which he was court-martialed and this is laid out in our opening brief, do not necessarily establish any of the elements of the felony statutes that the government cites. Moreover, in light of the heightened procedural protections available in a civil proceeding, it is not certain that Mr. Jimenez would have been convicted of anything. And so for that reason, while the case ---- He wouldn't have been convicted of anything? Had he proceeded in civilian court, it is not certain, in light of the heightened procedural protections available in a civil criminal trial, that he would have been convicted of anything, no. He pled guilty to these offenses in a court-martial. He pled guilty ---- In an administrative determination of a dishonorable discharge. He pled guilty to the offenses that Judge Pooler just mentioned. That's right. But, of course, one makes a decision to plead guilty or proceed to trial in light of the procedures available. And so Mr. Jimenez ---- I'm asking whether it's the equivalent of a civilian felony conviction. So I ---- In his admissions, his conduct would seem to me to fit exactly a civilian felony conviction. So I do resist the premise that his conduct, as adjudicated in a court-martial proceeding, brings him within the scope of the Heller dictum. He was not convicted of any felonies, and though he might have been, the possible existence of an alternative basis for disarming him does not bear on the facial validity of the provision he was convicted of violating in this case. That is to say, when we undertake facial constitutional analysis, we look at the text of the statute at issue, and we ask whether the text of the statute, that is, the fact of a dishonorable discharge period, suffices to support a categorical exclusion from an enumerated constitutional right. Just as a ---- Why should we do it that way? Why should we ---- why should we consider whether every dishonorable discharge is a felony? Because the Supreme Court has said when undertaking facial constitutional analysis, and this is Washington State Grange, the analysis is limited to the statute's face. And the Supreme Court and this Court have said that a facial challenger's personal situation is irrelevant. Are you aware of any other circuit court or district court in this country that has ruled on this particular section of 922G relating to dishonorable discharges? No. As far as the party's research has revealed, this is a question of pure first impression. And I think it's because the statute is really unlike any that this Court has considered in its post-Heller jurisprudence. Unlike any of the other provisions upheld in this case, the statute reaches into the home for all purposes, for all time, and to all arms. But you agree that if there is no ---- if he fits into the category of people who have lost the protection, then it doesn't matter that it reaches into the home. If there were a statute that, with a civilian felony conviction, prevented possession in the home, Heller would say that was permissible. Yes, Your Honor. I agree that at step one of ---- So the first step question is whether your client, given his discharge from the military, his dishonorable discharge, is a person who Heller says has basically lost his Second Amendment rights. And I want to take that head on. I want to note that it was most anomalous for the district court to truncate the two-step inquiry at step one. There are numerous other circuits, all collected in our brief, considering other provisions of 922G that have either held or assumed at step one that the right is intact. A dishonorable discharge does not fit within the Heller dictum. It's not a felony. It's not longstanding. And it's an ammunition restriction, not a firearms restriction. There's ---- So we have plenty of cases, though, under 922G1 that are prosecuted on the basis of possession of ammunition by a convicted felon. There's been no question that I'm aware of that Heller would permit that, would say that that is too far of a reach. I think ---- How is there a distinction between that section 922 and this one? What's the difference that it's ammunition? It's a combination of ---- I wouldn't say that the fact that it's ammunition alone takes it outside the Heller dictum. It's the combination that it's one of three removals from the Heller dictum. Moreover, if we proceed to scrutiny analysis, the government has a stronger interest in regulating firearms than bare ammunition, because firearms, even unloaded firearms, are more dangerous than bare ammunition. Are there any cases that make that distinction in the context of 922G1? No. Because all of the circuit cases considering 922G1 have simply relied on the Heller dictum and said laws regulating the possession of firearms by felons, their constitutionality is not questioned by Heller. But let me also say this. Heller's methodology is historical in nature. And this Court, for example, in Kachowski, has examined the historical antecedents of the right at issue. There is no historical evidence that the armed forces ever stripped dishonorably discharged service members of the right to bear arms. Indeed, given the importance of bearing arms at the time of the founding, that would have been inconceivable. The only historical evidence in this record is Winthrop's treatise, which the Supreme Court has relied on time and again, which says that a dishonorable discharge removes the offender from the military but entails no legal disability. The defense is to give rise to dishonorable discharge are desertion, mutiny, sedition, violence against officers. You're saying it's incomprehensible that the government would then, after making that conclusion, giving a dishonorable discharge, it would then also say, by the way, you can't have any weapons anymore either. I'm saying that in the posture of this case, it's the government's burden to rebut the presumption of Second Amendment protection, and the government has adduced no historical evidence to support that claim. However sensible it may seem as we sit here today, it's simply the government's position met. Let me also say this. The procedure in this case, that is the truncation of the analysis at step one, resulted in excusing Congress and the government of its burden to show an empirical justification for the entrenchment on an enumerated right. When Congress prohibited ammunition in 1986, it repealed prior legislative findings, and thus Congress adduced no empirical evidence to support this restriction. Below, Judge Schofield invited the government to submit empirical evidence supporting this ban, and the government elected not to. That is, once we proceed to scrutiny analysis, whether because we, the court holds that the ban is not categorically excluded or assumes it, as has been done in many cases, scrutiny analysis compels a decision in Jimenez's favor. There is simply no empirical basis for the restriction. Sotomayor, even intermediate scrutiny? Yes, Your Honor, and yes, Your Honor, in this Court's 2015 decision in New York State Rifle and Pistol Association, provisions of both New York and Connecticut law were Is this an argument that you would say applies even to felons convicted in civilian proceedings? That Congress cannot, under the Second Amendment, prohibit them from possessing ammunition because there wasn't an adequate showing of need? No, I think the Heller Again, why would there be a difference for the court-martial proceeding if we were to I agree if this Court were to conclude that a dishonorable discharge is equivalent to a felony, and let me pause there and say the only basis for that conclusion would be a small, arbitrary data set compiled years after the relevant points in time. But I agree, if this Court were to conclude that those things were equivalent, then there would be no need to proceed to scrutiny analysis. It is the law that a court-martial proceeding is a subsequent bar to criminal prosecution based on the same facts. That's been the Supreme Court's holding since the middle of the 19th century. If that's the case, then why isn't it entirely appropriate under the Heller Dicta, which does not purport to be exclusive, but to the extent it says, well, if you have a felony conviction, under how we treat court-martials for purposes of double jeopardy, I don't know why we wouldn't say, well, is that the kind of court-martial that would prevent you from being prosecuted for that conduct in a felony civilian prosecution? So, again, if Mr. Jimenez had been proceeded against in a civilian prosecution and had been convicted, which he might not have been, notwithstanding the facts alleged and notwithstanding his guilty plea, then we would not be presenting this claim. Sotomayor, I'm now asking you, why, given the double jeopardy rules about court-martials, I mean, you're not disputing that they couldn't prosecute him tomorrow for unlawful sale of these firearms that he sold as a member of the military. No, I agree with you. You would invoke double jeopardy because he had been already punished for that conduct. That's right. Right. But the equivalency is a felony prosecution. Well, again, the double jeopardy rule, I think, flows from the concept that both offenses would be proceeded against by the same sovereign. And why don't we consider in all of this, why don't we do as applied analysis, your client wasn't trying to possess a firearm or ammunition in his home. He was out in what the government contends was an attempted sale. He's not prosecuted for the gun that was the subject of the transaction. Instead, it's the bullet that's in his pocket. But we're not talking about anybody trying to possess firearms or ammunition in their home for self-defense. How is that Second Amendment right even relevant to your client's conduct? So as a factual matter, I think it's – it was accepted by the pre-sentence report and Judge Schofield that Mr. Jimenez was the driver to what he expected to be a sham gun sale and came into the possession of the bullet when the individual who had arranged to fraudulently offer for sale the firearms tossed it to him. That's not an exercise of recognized Second Amendment rights. So again, relying on the Supreme Court's admonition that in facial constitutional challenges, we limit ourselves to the text of the statute and the challenger's personal situation is immaterial. But do we get there? Do we even get to that analysis if the statute is not being unconstitutionally applied to your client? I mean, your suggestion is that that language completely wipes out Salerno and other cases that have talked about how to do – that outside the First Amendment. Let me address Salerno in particular in light of Heller. Quickly. Your time has long since expired. Yes, Your Honor. I'm happy to reserve. I'll say this. If Salerno were the operative rule in this context, there could never be a successful facial challenge to a firearms restriction because every firearms restriction could constitutionally be applied to, at a minimum, felons and the mentally ill. The fact that Heller itself invalidated a D.C. law on a facial basis without inquiring into the challenger's personal circumstances confirms that Salerno can't be the dispositive test. Thank you. Thank you. We'll hear from the government. Good morning, Your Honor. Assistant United States Attorney Samuel Raymond for the United States. May it please the Court. The appellant's facial challenge to Section 922G6 must be rejected. First, because the appellant does not assert that he himself, as an individual convicted by a court-martial for felonious conduct, has any Second Amendment rights that can be vindicated, and did not in this case raise a challenge to the statute as applied to himself, he cannot challenge the statute on its face. Second, to the extent he could raise a facial challenge. The Supreme Court has said that a facial challenge requires you to look to the terms of the statute. Now, why don't you tell us why you don't think we should be persuaded by that? Well, Your Honor, I would point the Court to the Supreme Court's decision in County Court of Ulster v. Allen, 442 U.S. 140, which states that a party has legal standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. In this case, Mr. Jimenez did not have any Second Amendment rights that could be vindicated, and so he cannot raise, with respect to some facial challenge, another individual's rights. What did the Supreme Court mean when it said that a facial challenge requires you to look at the face of the statute? Your Honor, I think in this context of an individual who has already been adjudicated by a due processly acceptable method, that he is a felon or committed felonious conduct, he has already been adjudged to be within a scope that it does not have protected Second Amendment rights. So, for example, in Heller, that individual, that was a civil case in which the individual appeared in court filing a civil complaint and stating that as a matter that the Court needed to credit under Rule 12, that he was a law-abiding citizen and therefore could vindicate the rights of other law-abiding citizens on its face, the statute and could challenge the statute underlying the Heller decision on its face. Whereas here, by contrast, this is an individual already adjudicated to fall within the categorical bar on felons, regardless of the exact method by which they are adjudicated, so so long as that is consistent with due process, and thus lies within the statement in Heller that possession, bars on possession by such individuals is constitutional. Would you agree, though, that you can be dishonorably discharged for conduct that would not constitute a civilian felony? Yes, Your Honor. Does that make a difference, though, with the dictum in Heller? No, Your Honor. There is longstanding ---- For example, dereliction of duty, disobeying an order. Well, Your Honor, first, the appellant in a number of places in his brief diminishes some of the severity of those military offenses, including desertion, which Your Honor mentioned before. The military can punish desertion during a time of war with death. That is a particularly severe military offense. And as to many of the other offenses that the appellant cites to, those are actually punishable by the military, most of them, by a term of confinement of at least one year. I don't disagree about that, but it seems to include other offenses, though, that would not rise to the level of felony. That's possible, Your Honor. In that case, those individuals may be able to raise an as-applied challenge to this statute, but that does not affect Mr. Jimenez's challenge and it doesn't affect the facial validity of the statute as a whole. If you agree with Judge Droney that a person could be dishonorably discharged for conduct that would not be a felony, what is the basis for supporting this prohibition on Mr. Jimenez having a gun? Your Honor ---- And ammunition. Yes, Your Honor. So first of all, and contrary to the appellant's argument, there is some longstanding historical evidence that individuals who had been punitively separated from the military for commission of serious military offenses could have civil disabilities imposed on their constitutional rights. For example, the appellant cites Kurtz v. Moffitt, a Supreme Court case from the 1880s, which discusses the congressional statute passed in 1865, which punished desertion and the Supreme Court made clear in Kurtz v. Moffitt, desertion after someone was punitively separated by court-martial with denaturalization, forfeiture of all civil rights. Here, that decision was in the underlying congressional statute, and its successor was later held unconstitutional by the Supreme Court in Troop v. Dulles. But there is longstanding historical evidence that Congress can impose civil disabilities and disabilities on civil rights for individuals who have been separated punitively by the military. Is there any evidence, though I know we've had evidence in the past, that felons tend to commit more violent crimes than the rest of us? There's evidence that's put forward from time to time before Congress. Is there the same kind of data for dishonorably discharged individuals, that they're more likely to be violent after they're discharged? Your Honor, I don't believe that there is specific as to dishonorable discharges. But again, given the fact that many dishonorable discharges, at the least, were convicted of felonious conduct, the similar studies that demonstrate that such individuals are more likely to misuse firearms would have similar weight here. But this gets at the issue opposing counsel raised about empirical evidence. If we're applying intermediate scrutiny, you have the burden of persuasion as to the constitutionality of this law. Did you put in any empirical evidence in this case? Yes, Your Honor. We put in empirical evidence. I think it is fair to say the empirical evidence shows, at the least, that the statute is not being applied overbroadly now. The appellant has now disclaimed any empirical evidence of the sort Judge Stroni was just inquiring about. Should we believe that a person who has been dishonorably discharged is more likely to commit gun crimes or any other crimes than the average person who honorably leaves the services? Your Honor, first of all, I don't believe there is a requirement that the government submit empirical evidence in all cases, especially under intermediate scrutiny. But you have the burden of persuasion if it's — if we're — if we're dealing  Yes, Your Honor. The Supreme Court in a case applying strict scrutiny referenced that some of the evidence used to justify restrictions can be based on history, consensus, and common sense. In this case, the government has submitted historical evidence regarding how dishonorable discharges — historical and modern practice about how dishonorable discharges, especially for felony equivalents, can have civil rights stripped. The government cited to, for example, the right to vote, inclusion on the sex offender registry notification list. And as a historical matter, in Kurtz v. Moffitt, the Supreme Court at least countenances absolute denaturalization procedures for individuals who had deserted from the military and were found to — Are you saying that we do this analysis by reference to discharge generally, discharges that are the equivalent of civilian felonies, or the discharge for the particular conduct at issue in this case as it equates to a civilian felony? Which category are you urging us to do this analysis with respect to? Your Honor, as an initial matter, this individual, the appellant, he does not have Second Amendment rights that could be vindicated. That's — that's as an initial matter. Once one were to address his facial challenge, I think then the fact that dishonorable discharges upon individuals who had committed felonious conduct necessarily means that this statute has constitutional applications under the test in Salerno. The extent that the statute does preclude people from possessing firearms and — and ammunition, if Congress wanted this to apply to persons who are the subject of military discharges, dishonorable discharges, why don't we ask them to say so? Why don't we ask Congress to — To say so. I mean, they've told us that they want it with respect to felons, which means in the civilian system, because the military doesn't mark its basis for discharges, felonies or non-felonies. So we're — the language Congress has used comes from the civilian criminal justice system. If they want to apply it to discharges, dishonorable discharges across the board or some subcategory of it, why don't we expect them to say so? Well, Congress did that, Your Honor. That is the statute at issue here, in which it applied the possession bar to those dishonorably discharged from the military in 922g6. Yes. But with respect to which category? Oh, you're saying within — well, I don't believe that there's — first, the government does not concede that as to those individuals who had committed serious military offenses, though perhaps without a civilian — a civilian equivalent, that those individuals themselves have constitutional rights, Second Amendment rights that can be vindicated in this context. As discussed before, these are very serious military offenses that the Congress and that the military imposes very serious punishment on. So Congress did have the power to dispossess those individuals as well, and that's what Congress did here. Thank you, counsel. Thank you, Your Honor. Mr. Harveed, you're reserved two minutes for rebuttal. Thank you, Your Honor. Let me begin with the question of the equivalence of dishonorable discharges and felonies. Judge Droney, you're absolutely right. Since the founding and since the ratification of the Second Amendment, military law has always permitted dishonorable discharges for conduct that has no civilian felony analog. That's not to say that that conduct isn't properly punished or that punishing it isn't important to military discipline. Of course it is. But the precise question before this Court is whether this case can be shoehorned within the Heller dictum, which says felons. It can't. The government has — I would say so for two reasons. One, because the challenger's personal situation is immaterial, and two, because he was not adjudicated guilty of that conduct in a civilian proceeding. But more to the point, the government's statistical showing on dishonorable discharge felony equivalent is quite limited in time. It does not the time of the ratification, the time of the enactment of the statute. And moreover, this cannot be how facial constitutional adjudication proceeds. If the military's practices change tomorrow, it cannot be that the statute's facial constitutionality would also change. And that's the Supreme Court's decision in Mueller v. Allen, cited in our opening brief, that the facial constitutionality of a statute does not change. Reversal here does not mean that Mr. Jimenez is free to arm himself. New York State law prohibits the possession of firearms without a license, and a licensing officer is empowered to deny a license for want of good moral character. And denying Mr. Jimenez a license on that basis would be well within the licensing officer's discretion. Let me finally say that taking Heller seriously, taking the Second Amendment seriously, as Justice Thomas has recently reminded us, matter. The Second Amendment is not a second-class right, and there was no demand in Heller itself that the challenger make a showing of qualification to possess firearms before the Supreme Court adjudicated his facial constitutional challenge. At the end of the opinion, the Court says, we assume that the District of Columbia will issue Heller a license if he's not disqualified. It was error for Judge Scofio to require more of Jimenez than was required of Heller himself.